In re B. HOLLIS KNIGHT COMPANY, Debtor.

Charles Darwin DAVIDSON, Trustee, Appellant,

v.

UNION NATIONAL BANK OF LITTLE ROCK, Appellee.

No. 79–1054.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1979.

Decided Aug. 30, 1979.

Charles Darwin Davidson, Little Rock, Ark., pro se.

W. R. Nixon, Jr., Little Rock, Ark., for appellee.

Before GIBSON, Chief Judge, and HEANEY and McMILLIAN, Circuit Judges.

HEANEY, Circuit Judge.

The trustee in bankruptcy appeals from a decision of the District Court directing him to pay Union National Bank of Little Rock $8,444.69, the amount owed to Union National by the debtor, B. Hollis Knight Company, Inc. (BHK), on the date BHK filed its petition in bankruptcy. The sole issue on appeal is whether Union National has a security interest in an account receivable of BHK that was perfected prior to the lien of the trustee. We conclude that the District Court applied an incorrect legal standard and, therefore, reverse and remand for further proceedings.

BHK, a mechanical contractor, received a $12,000 loan from Union National on November 26, 1976. The loan was evidenced by a promissory note and secured by various accounts receivable and other collateral. The security interest was supposedly perfected by means of financing statements that Union National had filed on all accounts receivable and contract rights owned or thereafter acquired by BHK. These financing statements had been prepared in connection with another loan to BHK and were filed on August 29, 1974, at the Pulaski County Circuit Clerk's office and at the office of the Arkansas Secretary of State. The filing in the office of the Secretary of State designated Ben H. Knight[1] and BHK as debtors. The filing in the Circuit Clerk's office, however, designated only Ben H. Knight as the debtor. Thus, as of November 26, 1976, Union National did not have a perfected security interest in BHK's accounts receivable since it failed to list BHK as a debtor on the filing in the Circuit Clerk's office as required by Arkansas law. *See* Ark.Stat. Ann. §§ 85–9–401, 85–9–402.

On January 11, 1977, BHK received another loan from Union National in the amount of $6,800. The loan was evidenced by a promissory note and secured by an assignment of an account receivable from a general contractor who owed $9,720 to BHK for work on a construction job completed on January 3, 1977. The assignment stated that it was intended

> as security for the repayment of indebtedness owing by the undersigned [BHK] to the said Union National Bank of Little Rock now in the sum of Six Thousand Eight Hundred & No/100—($6,800.00) and of any other indebtedness that may become due to the said Bank by the undersigned so long as any of the debt mentioned herein remains unpaid[.]

The assignment was signed by the president of BHK and a notice of the assignment was acknowledged by an authorized representative of the general contractor on January 11, 1977. This assignment was the only assignment to Union National from BHK. No financing statements were filed in connection with the transaction. On January 11, 1977, BHK's accounts receivable totaled $68,374.58.

On January 19, 1977, BHK filed a voluntary petition in bankruptcy. On that date, it owed Union National $6,814.90 on the January 11, 1977, note and $1,629.79 on the November 26, 1976, note for a total indebtedness of $8,444.69. The schedules filed with the petition listed accounts receivable of $68,364.68. The trustee, however, was unable to collect any accounts receivable other than the account which had been assigned to Union National. The trustee collected $8,919.72 of this account and placed this sum in a special bank account by agreement of the parties pending the outcome of this action.

In his complaint, the trustee alleged that Union National's security interest in the account receivable was unperfected and subordinate to the trustee's lien which came into existence on the date of bankruptcy. The Bankruptcy Court disagreed. It determined that Union National's security interest in the account receivable was perfected on January 11, 1977, prior to the trustee's lien. The court reasoned that the assignment of the account receivable was not a "significant part" of BHK's outstanding accounts receivable within the meaning of Ark.Stat.Ann. § 85–9–302(1)(e) and, thus, Union National was not required to file a financing statement. Consequently, Union National's security interest was perfected without filing under Ark.Stat.Ann. § 85–9–303(1). The court directed the trustee to pay Union National $8,444.69. The District Court affirmed the Bankruptcy Court.

The parties agree that for Union National to prevail, it must show that it has a perfected security interest in the account receivable under Arkansas law. The answer to this question turns on an interpretation of Ark.Stat.Ann. § 85–9–302(1)(e) which provides:

---

1. Ben H. Knight was the owner of BHK prior to July 1, 1976.

(1) A financing statement must be filed to perfect all security interests except the following:

    \*    \*    \*    \*    \*    \*

(e) an assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts of the assignor[.]

The parties have not cited to, nor has our research disclosed any Arkansas state court cases that discuss subsection (e). The only case that has interpreted it appears to be *Standard Lumber Company v. Chamber Frames, Inc.,* 317 F.Supp. 837 (E.D.Ark. 1970). In *Standard,* Chamber Frames, Inc., the debtor, a manufacturer of picture frames, sold K–Mart picture frames valued at $2,212.20. Standard Lumber Company, the secured party and a seller of building materials and millwork, was Chamber Frames' supplier. In order to secure its debt for supplies, Chamber Frames assigned Standard Lumber the $2,212.20 account receivable from K–Mart. Standard Lumber did not file a financing statement. In an action to recover on the debt, the United States was permitted to intervene and assert a claim under liens arising from unpaid taxes. The District Court determined that Standard Lumber had a perfected security interest in the account receivable notwithstanding its failure to file a financing statement which was perfected prior to the government's lien. The court reasoned that since the total of accounts receivable assigned amounted to only sixteen percent of Chamber Frames' outstanding accounts receivable, the assignment was not a significant part of the total accounts. Consequently, Standard Lumber was not required to file a financing statement under Ark. Stat.Ann. § 85–9–302(1)(e) to perfect its security interest.

The District Court relied on *Standard* in reaching its decision. It reasoned that the account receivable assigned to Union National represented roughly fourteen percent of the outstanding accounts and, thus, was not a "significant part" within the meaning of Ark.Stat.Ann. § 85–9–302(1)(e).

The trustee argues, initially, that the District Court erred in considering the bulk of BHK's accounts receivable as outstanding accounts, since most of the accounts were unearned by performance at the time of the assignment and, thus, were uncollectible by the trustee after bankruptcy intervened. The evidence established that out of the $68,374.58 listed by BHK as accounts receivable, approximately fifty percent of this amount constituted retainage on construction contracts. The retained amounts were listed on BHK's balance sheet as accounts receivable, although successful completion of the job was a condition precedent to receiving payment. Since BHK did not complete its work on any projects after it filed bankruptcy, the retainage proved to be uncollectible due to various counterclaims and setoffs.

    In our view, the District Court correctly included the retainage in the total outstanding accounts of BHK. Ark.Stat. Ann. § 85–9–106 defines "account" as "any right to payment for goods sold or leased or for services rendered \* \* \* whether or not it has been earned by performance." Since an account need not be earned by performance, the retainage was properly classified as part of BHK's outstanding accounts although it would not be paid until the job was satisfactorily completed. Moreover, the mere fact that the trustee was unable to collect certain accounts after bankruptcy would not remove these accounts from inclusion as BHK's outstanding accounts. The determination of whether an assignment constitutes a significant part of the assignor's outstanding accounts must be made on the basis of the facts available at the time of the assignment.

The trustee also argues that the District Court's interpretation of *Standard* was unduly restrictive. He contends that the court should have examined all of the circumstances surrounding the transaction in deciding whether the assignment was a significant part of the outstanding accounts.

The term "significant part" is not defined in the U.C.C. Although most courts have

not undertaken a careful analysis of this term, *see In re Munro Builders, Inc.*, 20 U.C.C.Rep. 739 (W.D.Mich.1976), two tests appear to have emerged as aids in its interpretation, the "casual or isolated" test and the "percentage" test. *See generally* J. White and R. Summers, Uniform Commercial Code § 23–8 at 807–809 (1972).

The casual or isolated test is suggested by the language of Comment 5 to U.C.C. § 9–302 which provides that

[t]he purpose of the subsection (1)(e) exemptions is to save from *ex post facto* invalidation casual or isolated assignments: some accounts receivable statutes have been so broadly drafted that all assignments, whatever their character or purpose, fall within their filing provisions. Under such statutes many assignments which no one would think of filing may be subject to invalidation. The subsection (1)(e) exemptions go to that type of assignment. Any person who regularly takes assignments of any debtor's accounts should file.

The test requires a court to examine the circumstances surrounding the transaction, including the status of the assignee, to determine whether the assignment was casual or isolated. *See, e. g., Abramson v. Printer's Bindery, Inc.*, 440 S.W.2d 326 (Tex.Civ. App.1969). If a court finds that the transaction was not part of a regular course of commercial financing, it will not require filing. The underlying rationale behind the test appears to be the conclusion that it would not be unreasonable to require a secured creditor to file if he regularly takes assignments of a debtor's accounts, but it would be unreasonable if this was not a usual practice.

The percentage test, in contrast, focuses on the size of the assignment in relation to the size of the outstanding accounts.[2] *Standard Lumber Company v. Chamber Frames, Inc., supra,* is generally cited as a case applying this test. J. White and R. Summers, Uniform Commercial Code

§ 23–8 at 808. *See also In re Boughner,* 8 U.C.C.Rep. 144, 149–153 (W.D.Mich.1970). The test attempts to define the term "significant part" in a manner that is consistent with the statute and that promotes certainty in application. J. White and R. Summers, Uniform Commercial Code § 23–8 at 808–809.

Some courts have taken the approach that a proper interpretation of the section requires application of both tests. *See, e. g., City of Vermillion, S. D. v. Stan Houston Equipment Co.,* 341 F.Supp. 707, 712 (D.S.D. 1972). We are in substantial agreement with the courts that take this eclectic approach.

Both of the policies underlying the two tests appear to be valid limitations on the scope of U.C.C. § 9–302(1)(e). The language of the section would not permit an assignee to escape the filing requirement if he received a large proportion of an assignor's accounts whether or not the transaction was an isolated one. *See In re Boughner, supra.* On the other hand, it is not unfair to require a secured party who regularly takes such assignments to file, since the comments to U.C.C. § 9–302(1)(e) indicate that the section was designed as a narrow exception to the filing requirement—not applicable if the transaction was in the general course of commercial financing.

We note, moreover, that *Standard Lumber Company v. Chamber Frames, Inc., supra,* is not inconsistent with this position. In *Standard,* the secured party, Standard Lumber Company, did not regularly take assignments from its suppliers. There was no question that the assignment was an isolated one and, thus, there was no reason for the District Court to consider the issue.

■ Thus, in the absence of any Arkansas law to the contrary, we hold that in determining what is a significant part of the outstanding accounts of the assignor, a court must examine all of the facts and circumstances surrounding the transaction,

---

**2.** Of course, the language of Ark.Stat.Ann. § 85–9–302(1)(e) requires a court to examine the total of all assignments to the secured party

whether or not they took place in a single transaction.

including the relative size of the assignment and whether it was casual or isolated.·

■ The trustee contends that we should not consider the assignment an isolated or casual one simply because Union National is a national banking institution that regularly lends money and has, on previous occasions, made loans to BHK. We disagree with the trustee's analysis. The relevant question is whether Union National regularly took assignments of accounts receivable. There is no evidence in the record that they did. The Bankruptcy Court found that BHK had not assigned any other account receivable to Union National and the trustee does not dispute this finding. The record does not indicate that Union National ever received another assignment of accounts receivable from any other person. While Union National may do so as a matter of fact, the assignment of accounts receivable is a specialized method of securing loans, and we are not willing to assume that it was a regular practice.

The trustee also contends that, under the circumstances of this case, it was inappropriate for the District Court to have applied an arbitrary percentage. We agree. The District Court improperly limited its inquiry since its analysis ignores the qualitative differences in accounts receivable.

The ultimate uncollectibility of an account receivable standing by itself would not remove the account from consideration as one of the assignee's outstanding accounts. If, however, the assignee knew when an assignment was made that certain accounts were uncollectible, he would also recognize that their value as outstanding accounts is minute. The reasoning is similar when there are significant limitations on the collectibility of some accounts.

An assignee would have to discount their value as outstanding accounts to determine whether his assigned account constituted a significant part of the total.

This analysis merely recognizes that the liquidity of an account receivable is one of the primary considerations of a lender who is secured by a lien on the account. An assignee who receives accounts that are not subject to any limitations is usually in a better position than one who receives accounts that are subject to some limitations, although each may hold the same dollar amount of accounts. Thus, the account assigned to Union National may be a significant part of BHK's outstanding accounts although it represented only fourteen percent of the total amount since it was the only account that was not subject to significant limitations on collectibility.

Although the District Court did not make a specific factual finding in this regard, there is sufficient evidence in the record to support a finding that Union National knew there were significant limitations on the collectibility of BHK's accounts receivable.[3] The president of BHK testified that he knew the only account he could collect within thirty days was the account assigned to Union National. It is reasonable to infer that he communicated this knowledge to Union National when he applied for the $6,800 loan, since Union National specifically requested the assignment of that particular account. Moreover, Union National had some familiarity with BHK's business practices and its assets insofar as it had loaned money to BHK on prior occasions. We infer from this that Union National may have known of BHK's precarious financial position and that there was a substantial risk that the remaining accounts would not be collected because the jobs would not be completed.

Since additional factual findings must be made prior to a determination of whether the account assigned to Union National constituted a significant part of BHK's outstanding accounts, we remand the cause to the District Court. On remand, the District Court shall examine the extent of Union National's knowledge of BHK's accounts

---

3. Union National knew of this fact because it had actual knowledge of it. *See* Ark.Stat.Ann. § 85–1–201(25).

receivable and determine how Union National's knowledge affected, or should have affected, its valuation of BHK's accounts. The court must then decide whether the account assigned to Union National was a significant part of the outstanding accounts in light of this valuation. The District Court should look at all of the facts and circumstances surrounding the transaction in making its decision.

The decision of the District Court is reversed and remanded for further proceedings consistent with this opinion.