In re AM INTERNATIONAL,
INC., Debtor.

AM INTERNATIONAL, INC., Plaintiff,

v.

TENNESSEE VALLEY AUTHORITY, Tennessee Data Systems, Inc., James L. Corby, Technical Data Systems, Inc., John Does 1–5 and Commerce Union Bank, Defendants.

Bankruptcy No. 82B04922.
Ancillary Adv. No. 383–02002.

United States Bankruptcy Court,
M.D. Tennessee.

Feb. 14, 1985.

James V. Doramus, Byron R. Trauger, Doramus, Gideon & Trauger, Nashville, Tenn., for AMI Intern., Inc.

Marc T. McNamee, Dearborn & Ewing, Nashville, Tenn., for Commerce Union Bank.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

This is an adversary proceeding ancillary to the AM International, Inc. Chapter 11 pending in the Northern District of Illinois. Much of this dispute has been resolved by prior orders. The remaining issues concern entitlement to monies paid by the Tennessee Valley Authority to Tennessee Data Systems for computer equipment purchased from AM International, Inc., and the conduct of the Commerce Union Bank in diverting those payments.

The following constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

At all relevant times, Tennessee Data Systems, Inc. ("TDS") was a seller of computers and word processing equipment. It operated five retail stores in Tennessee and Alabama selling IBM, XEROX, and other microcomputers to the general public. It also entered into contracts for longer term supply of equipment to various users.

AM International ("AMI") was a manufacturer of Jacquard brand word processing equipment. From time to time, TDS purchased Jacquard equipment from AMI under an independent sales contractor agreement. Much of this particular brand of equipment was purchased by TDS to service an indefinite quantity term contract between TDS and the Tennessee Valley Authority ("TVA"). Thus two important relationships were created: AMI manufactured and sold equipment to TDS and TDS sold equipment to TVA. There was never any direct contract between AMI and TVA.

The AMI–TDS relationship experienced many difficulties. TDS was late in its payments to AMI and in some instances failed to make payments at all. By March of 1981, the outstanding balance owed by TDS to AMI exceeded $800,000. Disputes arose concerning responsibilities for equipment maintenance. Negotiations between TDS and AMI failed to solve these problems and lawsuits were filed. By agreement dated August 24, 1981, TDS and AMI compromised the litigation. In the settlement agreement, TDS agreed to make a cash payment to AMI in the neighborhood of $600,000 and to execute a promissory note for the balance (approximately $200,000) of the account receivable. TDS also agreed to make all future purchases of Jacquard equipment from AMI on a "cash on delivery" basis.

In July, 1981, TDS obtained a line of credit from Commerce Union Bank ("CUB") up to $1,000,000, in part needed to pay its obligation to AMI. In consideration for the loan, TDS granted CUB a security interest in its inventory, accounts receivable and the proceeds of its accounts receivable and other collateral specified in the agreement. (Exh. 2). Financing statements perfecting the CUB security interest in accounts receivable and proceeds were filed with the Tennessee Secretary of State and the Alabama Secretary of State. On March 5, 1982, CUB loaned TDS an additional $300,000 and entered into a revised loan and security agreement which also granted CUB a security interest in the accounts receivable and proceeds of TDS. (Exh. 5). Appropriate financing statements were again filed.

Relations between AMI and TDS continued to be rocky through the Fall of 1981. AMI on occasion had refused to ship equipment to TDS because TDS had failed to honor its commitment to promptly pay AMI. As a result of AMI's refusal to ship equipment, representatives of AMI and TDS met in East Hanover, New Jersey in early December, 1981, to discuss the resumption of shipments and alternate methods of payment. The possibility of advance payment for equipment by TDS was discussed but dismissed as not feasible because of TDS's financial situation. Also, the idea of having TVA pay directly to AMI was considered, but ultimately abandoned because the terms of the TVA–TDS contract were hostile to any assignment of funds due TDS for equipment sold to TVA. The parties finally agreed that AMI would continue to ship equipment to TDS only if TDS would enter into a lockbox agreement by which TDS would be required to direct payment of TVA checks into a lockbox collection account. AMI did not want to use CUB as the collecting bank where the lockbox would be located so it suggested Park National Bank of Knoxville, Tennessee ("PNB") which was not otherwise involved in the transaction among AMI, TDS and TVA. It was realized at this meeting that TDS would have to approach CUB and get permission for the lockbox arrangement.

Following the East Hanover meeting, Mr. William Smith, chief finanical officer of TDS, contacted Mr. Roddy Story, senior vice-president of CUB, to obtain permission to establish the lockbox agreement with AMI. Mr. Smith explained to Mr. Story that AMI insisted on a lockbox agreement and would not ship any additional equipment unless a lockbox was set up to insure payment for the equipment. Under the terms of its security agreement, CUB could have forbidden this lockbox agreement. Mr. Smith testified that he did not originally feel that CUB would accept such an agreement. Tr. at p. 61–62. However, Mr. Story did agree to permit TDS to enter into the lockbox agreement. On December 30, 1981, the lockbox agreement was executed by PNB, AMI and TDS. Thereafter, on instructions to TVA by TDS, payments for equipment were sent by TVA to the PNB lockbox.

The PNB lockbox agreement (Exh. 1) provided that TDS would direct TVA to pay for invoiced equipment by check payable to

TDS and PNB.[1] Upon collection of the deposited funds to the lockbox account, PNB, acting as "paying agent for TDS and AMI," was required to wire-transfer to AMI its portion of the funds as set forth in the agreement (75% of the deposits). TDS agreed that unless otherwise authorized in writing by AMI, it would not direct TVA to make payments in any manner other than as provided in the lockbox agreement.

On March 14, 1982 AMI sold its Jacquard word processing division to Advanced Technologies Ventures, Inc. ("ATV"). The present controversy involves payments for equipment purchased before the sale to ATV.

On April 14, 1982, AMI filed a voluntary Chapter 11 petition in the Northern District of Illinois. AMI has continued to operate its business as a debtor-in-possession pursuant to 11 U.S.C.A. § 1107 (West 1984). CUB knew that AMI had sought Chapter 11 protection within one week following the date of the petition.

On or about April 29, 1982, officers of CUB met with Mr. Smith and Mr. Corby of TDS to discuss repayment of the TDS loan and protection of the CUB collateral. At this time TDS was experiencing severe financial difficulties and CUB witnesses testified that the bank wanted to more closely "monitor" its affairs. CUB ordered TDS to cancel outstanding payment instructions to PNB and instead to collect all accounts receivable including invoices from TVA through a new lockbox at CUB. AMI was not advised of this new arrangement. The TDS loan was not declared in default by CUB nor were any efforts made to liquidate collateral at this time. By letter dated May 12, 1982, Mr. Smith of TDS instructed TVA to make future payments under the TVA contract to a lockbox at CUB. TVA followed these instructions. As a result of the change in instructions, funds were deposited in the CUB lockbox which would otherwise have gone to the PNB lockbox under the December 30, 1981 agreement. The funds deposited in the CUB lockbox were allowed by CUB to flow into TDS's operating account to defray its continuing operating losses. AMI no longer received its 75% share of the deposits. Tr. at 71.

AMI filed this ancillary adversary proceeding to recover $100,110.71[2] representing AMI's share of payments actually made by TVA to which AMI claims it was entitled under the PNB lockbox agreement. It asserts that CUB subordinated its interest or is estopped from claiming entitlement to the TVA receivables by its consent to the PNB lockbox agreement. AMI claims that by inducing TDS to breach its lockbox agreement with AMI and PNB, CUB violated the automatic stay and wrongfully obtained funds to which the debtor-in-possession was entitled. Further, AMI requests treble damages under TENN.CODE ANN. § 47-50-109 for tortious interference with the TDS-AMI contractual relationship (the PNB lockbox agreement). In defense, CUB claims it held a perfected security interest in the diverted funds superior to and not subordinated to the rights of AMI. CUB also claims that under the unique facts of this proceeding any violation of the stay is minor and inappropriate for sanctions. Finally, CUB states that it had a proper business motive to protect its collateral and, therefore, had no malice as required for treble damage actions under TENN.CODE ANN. § 47-50-109.

■ Our first step is to examine the competing interests of CUB and AMI in the disputed funds. CUB's security interest covered TDS's accounts receivable, inventory and proceeds therefrom (Exh. 2). Although there was some argument at trial whether the TVA payments sprang from "accounts receivable" or "contract rights,"

---

1. The checks as actually written were payable to TDS, in care of the Park National Bank address.

2. This was the parties' stipulated amount of TVA invoice payments which would have gone to AMI if TDS had honored the PNB lockbox agreement. Invoices representing an additional $11,090.26 involve equipment shipped by AMI to TDS for which no record of any payment by TVA can be found. Since CUB's actions only involved redirection of actual TVA payments, there can be no recovery against CUB for these unpaid invoices.

we hold that these payments are properly designated as accounts receivable (and proceeds of accounts receivable) and are thus covered by the security agreement. CUB filed financing statements covering this collateral and paid the appropriate recording tax. Therefore, we conclude CUB had a perfected security interest in TDS's accounts receivable prior to the drafting of the PNB lockbox agreement of December 30, 1981.

■ The PNB lockbox agreement effected an assignment by TDS to AMI of a portion of the TVA account receivables. This assignment[3] created a security interest in the receivables in favor of AMI. Under TENN.CODE ANN. § 47–1–201(37) a security interest is "an interest in personal property ... which secures payment of or performance of an obligation." Here the TVA accounts receivable are the personal property and the debt owed by TDS to AMI is the obligation. Cases have held that where a subcontractor assigns to a supplier its right to payment under a contract, that assignment creates a security interest. *E. Turgeon Construction Co., Inc. v. Elhatton Plumbing & Heating Co.,* 10 U.C.C.REP. 1353, 110 R.I. 303, 292 A.2d 230 (1972); *Valley Bank of Nevada v. City of Henderson,* 528 F.Supp. 907 (D.Nev. 1981). The intent of the parties is the key and here it is clear that the parties intended the assignment of TVA payments to secure the debt owed from TDS to AMI. *See also In re Liles & Raymond,* 24 B.R. 627, 35 U.C.C.REP. 1258 (Bankr.M.D.Tenn. 1982) (debtor's assignment of its right to future milk proceeds created security interest on behalf of assignor).

■ AMI's security interest in the TDS–TVA receivables was not perfected under Tennessee law. No financing statement was filed in connection with the security interest created by the lockbox agreement. AMI argues that under TENN.CODE ANN. § 47–9–302(1)(e), there is no filing

requirement for "an assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts of the assignor." AMI carries the burden of proving that it came within this exception. *Chattanooga Brick & Tile, Inc. v. Agnew,* 18 U.C.C. REP. 1063 (Tenn.App.1976).

■ In analyzing the "significant part" requirement, the courts will look at the relative size of the assignment and whether it was a casual or isolated transaction. *See In re Hollis Knight Co.,* 605 F.2d 397 (8th Cir.1979). The evidence showed that the TVA receivables were never less than 50% of the total outstanding accounts receivable of TDS at all relevant times. An assignment of 75% of this account is a significant portion of the outstanding accounts of TDS. *See In re Liles & Raymond,* 24 B.R. 627, 35 U.C.C.REP. 1258 (Bankr.M.D.Tenn. 1982). Since financing the purchases of AMI equipment was essential to TDS' operations (*see* fn. 4), the assignment was not a "casual or isolated" transaction. Therefore, we conclude that AMI held an unperfected security interest in the TDS–TVA accounts receivable.

■ Normally, of course, the prior perfected security interest takes priority over the subsequent unperfected security interest. However, CUB's express consent to the PNB lockbox arrangement constitutes a subordination agreement and prevents it from asserting that priority.

TENN.CODE ANN. § 47–9–316 provides "nothing in this Article [Chapter 9 of the Tennessee Uniform Commercial Code] prevents subordination by agreement by any person entitled to priority." Under 11 U.S.C. § 510(a) "a subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." Per its security agreement with TDS, CUB could have forbidden the PNB

---

**3.** The TDS–TVA contract forbade an actual legal assignment of TDS' right to receive payment from TVA. However, the PNB lockbox agreement provided that a portion of the payments, as received, would go to AMI. Hence for our purposes, the lockbox "assignment" has the same effect as if TDS had actually assigned its legal right to payment to AMI.

lockbox agreement. Mr. Smith of TDS told AMI officials that "we could not have a lockbox without Commerce Union's approval." Tr. at p. 61. He also testified that he described the manner in which the lockbox would work to Mr. Story of CUB. Tr. at p. 62. The proof showed that CUB considered the lockbox proposal and then affirmatively consented to the lockbox arrangement[4] (Tr. at p. 62) and knew that AMI would rely on that consent. The CUB officers also knew that AMI was not willing to continue doing business with TDS unless a lockbox or similar arrangement was set up. In the absence of CUB's agreement to the lockbox, AMI would not have shipped equipment except on a C.O.D. basis. Tr. at pp. 36, 103. Mr. Smith of TDS testified that AMI was aware of CUB's security interest and that AMI considered that "the opening of the lockbox hinged on Commerce Union's agreement to let us do so." Tr. at p. 74.

The following testimony shows how Mr. Story, CUB senior vice-president, remembered his consent to the agreement.

Q. When you talked to Mr. Smith, did he ask you for permission to set up a lock box?

A. The best I could do is to rephrase my understanding of the conversation. Bill Smith called and said that they had had a meeting with AM, and in somewhat euphemistic terms, that he felt they would probably have to had [sic] a lock box agreement for the TVA receivables to insure future shipments from AM to TDS.

He asked if I would consider that. I did. I called him back a day later and said that it was okay.

Q. When you agreed to that, did you assume that if such an agreement was reached that payments would be directed to Park National Bank and then split between AMI and TDS?

A. Yes, sir.

Q. Did you know whether AMI would or would not ship equipment without a lock box?

A. While Bill Smith was not specific that they would not ship without the lock box; but I got the impression that they would not ship without the lock box, or that it was important to the future of the TVA relationship that this lock box be set up.

Q. And you also knew from the bank's perspective that a continued relationship with TVA was necessary to protect the outstanding million-dollar loan, didn't you?

A. For some length of time; yes, sir.

Q. But you thought that that role would diminish over the next three or four months?

A. Yes, sir.

Q. Did you say anything to Mr. Smith about reneging on the agreement or reserving the right to cancel the agreement?

A. No, sir.

Q. Did you anticipate that Mr. Smith would act on the basis of what you told him and in reliance on what told him?

A. Yes, sir.

Q. And you intended for him to do that?

A. I understood that he would set up a lock box.

Q. And that he would do it based upon your permission?

A. Yes, sir.

(Tr. at 154–155).

Looking at the situation in contract terms (although a formal contract is not required), all the elements are present. AMI offered the lockbox agreement to TDS who in turn requested permission from CUB. CUB told TDS that it agreed to the lockbox and TDS gave its acceptance to AMI. CUB knew or should have known

---

**4.** CUB had good reason to approve the lockbox arrangement. It knew that AMI would not sell any more Jacquard equipment to TDS without a guarantee of payment. TDS's commissions from sales to TVA were an important part of its efforts to achieve profitability. CUB officers described the TVA contract as the "backbone" of TDS. (Exh. 37). Without these sales the possibility of loan repayment to CUB would have been much less likely.

that AMI would rely on this acceptance to ensure its payment. CUB's approval would have meant nothing to AMI if AMI thought that CUB could have canceled the agreement unilaterally, whenever it felt like it. As its consideration, CUB realized the much-desired continuation of business between TDS and AMI. CUB's approval must be interpreted as an agreement to let AMI collect its 75% share in the TVA payments without CUB's interference. It may be, though we do not have to decide, that CUB could have cancelled its subordination agreement if it gave notice to AMI. However, it never did. The funds in dispute are related to invoices from shipments of equipment made by AMI in reliance on CUB approval of the lockbox agreement.

■ The subordination agreement which we find in these facts was communicated from CUB to AMI by TDS. A subordination agreement does not necessarily depend on a direct communication between the prior secured party and the new seller or lender. *See In re Thorner Mfg. Co., Inc.*, 4 U.C.C.REP. 595 (Bankr.E.D.Pa.1967) (one does not need to be a party to a subordination agreement to benefit thereby). Under TENN.CODE ANN. § 47–1–201, an agreement means "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance...." In *Williams v. First National Bank & Trust Co. of Vinita*, 8 U.C.C.REP. 679, 482 P.2d 595 (Okla.1971), the court held that a subordination "agreement" can be inferred from words of the parties, course of dealing, surrounding circumstances and the like. Here, AMI agreed to the lockbox arrangement only after CUB agreed to its use and was, therefore, entitled to assume that CUB would not interfere with its right to payment under the agreement. Although CUB did not converse with AMI, TDS functioned as a conduit between the two and no party disputes that actual authorization for the lockbox was directed by CUB through

TDS to AMI. CUB knew that AMI and TDS wanted its permission because AMI needed assurance of payment. All parties abided by the lockbox agreement for some period of time and AMI received its share of the TVA payments without interference from CUB until May of 1982.

■ Even if CUB's consent does not amount to a contractual subordination agreement under the U.C.C., there are equitable reasons why AMI's interest in the payments is superior to CUB's. The present situation is similar to the facts of two recent district court cases from the Middle District of Tennessee. Both *Nasco, Inc. v. New York Information Systems, Inc. (In re Advisory Information and Management Systems, Inc.)*, No. 3–84–0768 (M.D.Tenn. Aug. 27, 1984) and *Advisory Information and Management Systems, Inc. v. New York Information Systems, Inc.*, No. 3–84–0534 (M.D.Tenn. July 13, 1984)[5] involved three-way agreements between a manufacturer (Prime), a seller (AIMS) and a buyer (NYIS). The manufacturer agreed to ship to the seller only when the buyer agreed to pay by check drawn jointly to the manufacturer and seller. In each case the seller filed bankruptcy after shipment from manufacturer to buyer but before payment by buyer. In each case the court held that the interest of the manufacturer in an invoiced account receivable was superior to that of the seller who claimed the receivables as debtor-in-possession pursuant to 11 U.S.C.A. § 544.

Both opinions relied on the fact that the manufacturer would not have shipped unless, as in the present case, special payment provisions were made. The only factual distinction is that in those cases a contract for payment was found between the buyer and manufacturer while under our facts there was no direct contract between the manufacturer (AMI) and the buyer (TVA). However, the practical effects of the arrangements are substantially the same. The seller agrees to forego its right to receive 100% of the invoiced ac-

---

5. The district court decisions in both of these cases reversed contrary decisions of this court.

We are bound to apply the district court's analysis and have done so in this alternative holding.

counts receivable—in one arrangement by use of a jointly drawn check, in the present situation by a lockbox agreement. AMI, like Prime, shipped only after receiving assurance from all parties that it would be paid pursuant to the PNB lockbox agreement. As Judge Wiseman described the situation in *Advisory Information and Management Systems, Inc. v. New York Information Systems, Inc.*, No. 3–84–0534, the manufacturer "should not now be mulcted by AIMS [the seller] merely for seeking to accommodate all parties and to ensure payment for its equipment." Slip op. at 5. Neither should AMI be deprived of its right to 75% of the TVA receivables granted to it by virtue of the lockbox agreement agreed to by all parties. It would be inequitable to allow CUB to first consent to the arrangement and then later "pull the rug out" when it decided to shift the direction of the payments for its own purposes.[6]

CUB argues that it never gave up its perfected security interest in the TVA receivables, but merely consented to the PNB lockbox agreement until such time as it exercised its perceived right to foreclose on the collateral and redirect payment of the TVA receivables. This claim is factually unsupportable because, as indicated above, the consent communicated by CUB through TDS to AMI, contained no reservation of right to cancel the lockbox at the whim of CUB. AMI would not have agreed to an arrangement that put its right of payment in the hands of CUB and no such condition was imposed by the bank officers involved. There is also serious question as to what authority CUB was relying on when it ordered TDS to redirect the payments intended for the PNB lockbox. Under the March 5, 1982 security agreement, CUB had certain rights in the event of a default[7] by TDS. These included the right to demand that all receipts from sale of inventory or collection of receivables be deposited in a bank account over which CUB had sole power of withdrawal. (Exh. 5, Sec. 3.3). The agreement also gave CUB the right, in event of default, to directly collect TDS's receivables. (Exh. 5, Sec. 3.2). However, CUB did not rely on either of these provisions. CUB never instructed TVA to pay CUB directly nor was money ever deposited into a special account over which only CUB had the right of withdrawal. (Testimony of Mr. Smith, Tr. at p. 106, Mr. Babish Tr. at p. 148). Instead it simply believed that it had a general right to control the collateral because of its perception that TDS was in default due to its unprofitability. (Testimony of Mr. Babish, Tr. at p. 120). Since CUB neither purported to act under its security agreement nor actually followed any provisions of that agreement, it is unclear what right it had to cause the redirection. (Testimony of Mr. Story, Tr. at 195–201). CUB did not use the redirected funds to pay off the outstanding note, but instead the funds were placed in TDS's general corporate account and disbursed as any other funds. Tr. at p. 71.

---

**6.** CUB cites *General Cable Co. v. Altek Systems, Inc.*, 14 B.R. 144 (Bankr.N.D.Ill.1981) for the proposition that TDS and AMI could not deprive CUB of its security interest by merely entering into an agreement to divide the payments as they were received. In that case a secured party (Pioneer) was perfected in the accounts receivable of a debtor (Altek) who assigned a certain account receivable to another creditor (General Cable). The court held that General Cable failed to perfect its security interest in the specific account and, therefore, Pioneer had priority. However, nowhere in that case was there any mention that Pioneer consented to or even knew about the assignment of the one specific account to General Cable. Thus, the holding does not apply to our facts where CUB expressly approved of the contract whereby TDS gave up its right to 75% of the payments.

**7.** CUB never actually gave TDS a written notice of default until at least November of 1982, well after it ordered redirection of the TVA payments. Tr. at pp. 171–172. However, CUB maintains that TDS was in default under the security agreements in late April or May because of its failure to achieve operating profitability on a monthly basis. Tr. at p. 196. (*See* Exh. 5, ¶ 4.2j). Mr. Corby of TDS testified that CUB informed TDS that it was in default on its loan at a time before the April 29 redirection order was given. Mr. Corby agrees that TDS was technically in default at that time. Tr. at p. 219.

■ AMI claims that the redirection of TVA payments at CUB's insistence constituted an inducement of breach of contract of the PNB lockbox agreement.[8] It asks for treble damages under TENN.CODE ANN. § 47–50–109 (formerly § 47–15–113) which states:

It shall be unlawful for any person, by inducement, persuasion, misrepresentation, or other means, to induce or procure the breach or violation, refusal or failure to perform any lawful contract by any party thereto; and, in every case where a breach or violation of such contract is so procured, the person so procuring or inducing the same shall be liable in treble the amount of damages resulting from or incident to the breach of the contract; and the party injured by such breach may bring his suit for the breach and for such damages.

The elements of this cause of action were recently set forth in *Continental Motel Brokers, Inc. v. Blankenship*, 739 F.2d 226, 229 (6th Cir.1984). They are:

1. There must be a legal contract;

2. The wrongdoer must have known of the existence of the contract;

3. The wrongdoer must have intended to induce its breach;

4. The wrongdoer must have acted maliciously;

5. The contract must have been breached;

6. The act complained of must have been the proximate cause of the breach of the contract; and

7. Damages must have resulted from the breach.

*See also Edwards v. Travelers Insurance*, 563 F.2d 105, 120 (6th Cir.1977) quoting *Dynamic Motel Management, Inc. v. Erwin*, 528 S.W.2d 819, 822 (Tenn.App.) *cert. denied*, (1975).

■ AMI carries the burden of proof in showing the existence of these elements. The Tennessee courts indicate that this burden of persuasion is somewhat elevated: "The remedy claimed in this section is purely statutory, providing for an extreme penalty, and should not be enforced except upon a clear showing." *Lichter v. Fulcher*, 125 S.W.2d 501, 508, 22 Tenn.App. 670 (1938). CUB does not dispute the existence of these elements with the exception of the malice requirement.[9] It claims that it acted with a proper business motive to protect its collateral and had no malice towards AMI.

■ Under Tennessee case law interpreting the treble damages statute, malice has been defined as "the willful violation of a known right." *Edwards* at 121. Malice in this context does not require ill-will or spite toward the injured party. It is usually held that the intentional commission of a harmful act without justifiable cause is the equivalent of "legal malice." *See, e.g., Salomon v. Crown Life Insurance Co.*, 536 F.2d 1233, 1240 (8th Cir.) *cert. denied*, 429 U.S. 961, 97 S.Ct. 387, 50 L.Ed.2d 329 (1976); *Law Research Service of Missouri, Inc. v. Western Union Telegraph Co.*, 336 F.Supp. 510 (E.D.Mo.1971); *Employers Liability Assurance Corp. v. Freeman*, 229 F.2d 547 (10th Cir.1955); 26 A.L.R.2d 1227–1285 § 10. If the actor has no legally protected purpose behind his action, he will be considered legally malicious. However, some actions are justified or priv-

8. AMI's right to proceed against CUB for inducement of breach is independent of any rights it might have against TDS for the actual breach of the contract. *Swift v. Beaty*, 39 Tenn.App. 292, 282 S.W.2d 655, 659 (1954).

9. CUB tries to make the argument that a "no fault" clause in the PNB lockbox agreement is a defense. This clause states that no breach shall be deemed to occur when the cause of the failure to perform is beyond the control of the performing party. This argument fails for several reasons. First of all, although TDS felt it was in no position to argue with CUB, it could have refused to go along with CUB or at least warn AMI of CUB's demands. Secondly, this clause is typically limited to excuse performance due to acts of nature, governmental action, or other causes beyond the parties' control. Most importantly, it would be unreasonable for CUB, the party causing the failure to perform, to claim the benefit of a clause which excuses non-performance when it arises from no fault of the non-performing party.

ileged. "Procuring the breach of a contract in the exercise of an equal or superior right ... is justification for what would otherwise be an actionable wrong." *Fury Imports Inc. v. Shakespeare Co.*, 554 F.2d 1376, 1383 (5th Cir.1977) (quoting New York law). *See* cases at 26 A.L.R.2d 1227–1285 § 29, § 32.

The purpose and motivation of the alleged interferor is sometimes considered by the courts. *See Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1128 (6th Cir.1981) *cert. denied*, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982) (applying Ohio law); *DeVoto v. Pacific Fidelity Life Insurance Co.*, 618 F.2d 1340 (9th Cir.) *cert. denied*, 449 U.S. 869, 101 S.Ct. 206, 66 L.Ed.2d 89 (1980); *Cesnik v. Chrysler Corp.*, 490 F.Supp. 859, 871 (M.D.Tenn.1980) (applying Kentucky law).[10] The second restatement of torts states that "in determining whether interference is improper, it may become very important to ascertain whether the actor was motivated, in whole or in part, by a desire to interfere with the others' contractual relations." Section 767, comment d. *See* Prosser, *Law of Torts*, 942 (4th ed. 1971) ("Given the intention to interfere with the contract, liability usually will turn upon the ultimate purpose or object which the defendant is seeking to advance"). As the Ninth Circuit panel explained in *DeVoto, supra*, 618 F.2d at 1348, "[M]otive or purpose is usually an accurate measure of the advantage the actor sought and of its just or unjust character." The most recent Sixth Circuit decision discussing the malice element of the Tennessee treble damages statute indicates that the intent and motivation of the inducing party is an important consideration.

In *Continental Motel Brokers, supra.*, 739 F.2d 226, a brokerage contract existed between Blankenship (general partner in a limited partnership which owned a hotel)

and certain brokers. The brokers contacted a potential purchaser named Fleck and Blankenship thereafter agreed to sell the hotel to Fleck and business entities he controlled. Because a first mortgage holder refused to waive a "due on sale" clause and for tax reasons, the deal was restructured so that a Fleck-controlled entity would buy controlling interest in the limited partnership. Because of the structure of this transaction, the brokers were not paid their fee as they would have been under a conventional sale of the hotel. The brokers sued Fleck for inducing Blankenship to breach his contract with the brokers. In holding for the brokers, the court considered certain comments of Fleck as showing the necessary malice. Fleck told the brokers that there was "no room in this deal" for them. He stated that if the brokers tried to delay the closing in order to obtain their fee, he would attempt to ruin their reputations nation wide and to put them out of business. In discussing matters with his attorney, Fleck stated "f__k the brokers." *Continental* at 231. The discussion of Fleck's attitude was utilized by the Sixth Circuit panel to show Fleck's intention to purposely cause the brokers to lose the benefits of their contract.

▮▮▮ The treble damages issue is an especially close factual question in this proceeding. There is evidence of disregard by CUB for the known legal rights of AMI. As indicated above, there is no doubt that CUB knew of the lockbox agreement, that CUB consented to the arrangement, that CUB knew of AMI's bankruptcy and knew that its redirection orders to TDS would upset AMI's expectations of payment. However, it is the finding of this court that the proof falls short of the applicable elevated standard: The proof fails to *clearly* show malice by CUB.

**10.** CUB contends that Judge Wiseman intended his analysis of Kentucky law in *Cesnik* regarding a privilege to interfere when protecting one's economic interests to be equally applicable to actions under the Tennessee treble damages statute. A closer reading of the opinion reveals that this analysis was not necessarily intended to apply to Tennessee law. *Cesnik* at

874 fn. 24. However, there is no reason to think that Tennessee would not recognize such a privilege. Under this defense the defendant may interfere with another's contractual relations to "protect his own present existing economic interests, such as ... a financial interest in the affairs of the person persuaded." *Prosser and Keeton on Torts*, § 129 at 986 (5th ed. 1984).

CUB officers assigned to the TDS loan testified that they believed they were entitled to cause the redirection of the TDS/TVA receivables because of CUB's rights under the perfected security agreements with TDS. Although we hold that CUB had subordinated those rights, we are pursuaded that the bankers' (erroneous) belief was not formed in bad faith or without legal justification. *See Institutional Food v. Golden State Strawberries,* 587 F.Supp. 1105, 1111 (E.D.Mo.1983) ("... [P]laintiff must ... [show] that defendant acted maliciously, in bad faith, without belief in the merit of its claim ... or without any reasonable basis for believing in the merit of its claim."). The evidence does not clearly demonstrate that CUB was improperly motivated to defeat AMI of its superior right to payment. We believe enough of the bankers' explanation to hold that AMI failed to carry its difficult burden of proof of malice.

The CUB officers maintained at trial that their purpose in having the TVA payments redirected was to enable CUB to exercise more control over TDS's affairs. Mr. Babish, the special loan officer assigned to the TDS case, testified that "my purpose in having the lockbox moved and the only purpose I was looking to was to monitor what was going into the lockbox. I was interested in monitoring it as far as receivables were concerned, how much they were getting and trying to match that up with the inventory, and trying to match that up with their sales and so forth." It is unclear whether the redirection of the TVA payments to the CUB lockbox actually enhanced CUB's ability to monitor its loan. However, Mr. Babish adamantly testified that after the redirection took place, he had more timely information about TDS's cash flow position and was better able to take "quick action" when required. (Tr. at 123–124, 128–133). He also testified that at the time of the redirection, he assumed that TDS would still be responsible for paying AMI its share of the TVA payments. Tr. at 121, 136. It is possible to speculate that CUB had darker motives for its actions including the possibility that it felt that these payments would be lost in the shuffle of AMI's bankruptcy. However, speculation and inference cannot be a basis of recovery under the clear showing standard.

CUB's mistaken belief in its right to redirect and dispose of the lockbox payments does not provide the bank with a defense to AMI's assertions that the bank violated the stay of 11 U.S.C. § 362. The action taken by CUB in causing the redirection of the TVA payments was a blatant violation of the automatic stay for which sanctions should be imposed. It is undisputed that AMI filed its bankruptcy petition at least two weeks before the CUB officers caused the redirection of the payments and that these officers were aware of AMI's bankruptcy and had knowledge of the effect of the automatic stay.

Under 11 U.S.C. § 362(a)(3), the bankruptcy petition operates as a stay, applicable to all entities of "any act to obtain possession of property of the estate or of property from the estate ..." The "act" here was CUB's order to TDS that it cause the TVA payments to be redirected from the PNB lockbox to an account at CUB. The bank knew that this redirection would wrest from AMI control of its 75% share of the TVA payments. After ordering redirection of the TVA payments, CUB made no effort to ensure that AMI was paid even though it acknowledged that AMI was still entitled to receive its 75% share. (Tr. at 121, 136). The "property of the estate" is AMI's contractual right to receive 75% of the TVA payments through the lockbox agreement. CUB concedes (Tr. at 300) that under the broad mandate of *United States v. Whiting Pools,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983) this contractual right is included in the debtor's estate under 11 U.S.C. § 541. *See* 4 L. KING, COLLIER ON BANKRUPTCY § 541.10[5] (15th ed. 1984) ("the property accruing to the estate under section 541(a)(1) includes all rights of action the debtor may have arising from contract"). "Subsection 362(a)(3) adopts this expansive definition of property and enjoins any efforts to obtain possession of property from the debtor re-

gardless of title." 1 NORTON BANKR.L. & PRAC. § 20.07.

▮ Even though CUB officers knew of AMI's bankruptcy, they testified that they were unconcerned that the redirection order might violate the automatic stay. (Testimony of Mr. Story, Tr. at 167). It is no defense that CUB did not receive formal notice of the stay from a bankruptcy court. *See In re Eisenberg,* 7 B.R. 683, 3 COLLIER BANKR.CAS.2d 440 (Bankr.E.D.N.Y.1980). When a party acts in knowing violation of the stay they take the risk that their actions will be found wrongful. The proper recourse for CUB knowing of the bankruptcy filing and of AMI's right to payment under the lockbox agreement, was to seek an adjudication of its competing claims in the bankruptcy court. *See Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962, 968 (5th Cir.1983) ("It is for the bankruptcy court not a stakeholder with possession of assets in which the debtor has at least a legal interest, to determine such contentions [of priority].") CUB purposely failed to inform AMI or anyone connected with the bankruptcy case of its plans to cause the redirection. As a sophisticated commercial institution familiar with the application and broad scope of the automatic stay, it knew or should have known that its actions would improperly interfere with the orderly collection and distribution of AMI's assets. *See also In re Reed,* 11 B.R. 258, 7 BANKR.CT.DEC. (CRR) 777, 4 COLLIER BANKR.CAS.2d 736 (Bankr.D. Utah 1981) ("a creditor will be in contempt of the stay if he abridges the protection to which he reasonably should know the debtor is entitled").

▮ It is appropriate to award costs and attorney's fees where an entity has knowingly taken action in violation of the stay. Costs may be awarded under Bankruptcy Rule 7054 and attorney's fees may be included in these costs when specifically requested in the pleadings under Bankruptcy Rule 7008(b). In *Wariner v. First State Bank of Livingston,* 16 B.R. 216, 5 COLLIER BANKR.CAS.2d 865 (Bankr.N.D. Tex.1981), the court awarded both costs

and attorney's fees where a creditor repossessed a truck after learning of the bankruptcy and failed to return the truck until after demand letters and litigation were instituted. In *Cusanno v. Fidelity Bank,* 29 B.R. 810, 10 BANKR.CT.DEC. (CRR) 793 (E.D.Pa.1983) costs and attorney's fees were awarded against a bank that violated the stay by placing an "administrative hold" on the debtor's checking account. The sanctions were awarded despite the fact that there was and still is a conflict among courts as to whether "freezing" of a bank account is a violation of the stay. *See also In re Conti,* 42 B.R. 122, 12 BANKR.CT.DEC. (CRR) 87 (E.D.Va.1984) (reasonable attorney's fee awarded even where violation of automatic stay was inadvertent). In this proceeding AMI was completely innocent and had a statutory right to have its assets protected by the bankruptcy stay. Great expense has been incurred in this ancillary proceeding by AMI to recover its property from the bank. AMI's general creditors should not bear the costs of vindicating the rights and recovering the money lost by AMI when CUB violated the stay. Costs of this proceeding, including reasonable attorneys' fees will be assessed against CUB upon appropriate application of AMI and its attorneys.

An appropriate order will be entered.