In re Tony R. BISHOP and Donna G. Bishop, Debtors.

FINANCEAMERICA PRIVATE BRANDS, INC.; Associates Financial Services, Inc. and First National Bank of Russellville, Plaintiffs,

v.

Tony R. BISHOP and Donna G. Bishop, Defendants.

Bankruptcy No. 84–5029.
Adv. Nos. S–307, S–308.

United States Bankruptcy Court, N.D. Alabama, W.D.

May 29, 1985.

Jerry W. Schoel, Birmingham, Ala., for debtors.

J. Brent Thornley, Jasper, Ala., Interim Trustee.

Eddie Beason, Russellville, Ala., for FinanceAmerica Private Brands, Inc. and Associates Financial Services, Inc.

Luke Alexander, Russellville, Ala., for First Nat. Bank of Russellville.

## MEMORANDUM OF DECISION

GEORGE S. WRIGHT, Bankruptcy Judge.

This cause came before the Court on the motions styled APPLICATION TO ABANDON PROPERTY and PETITION TO LIFT AUTOMATIC STAY filed by FinanceAmerica Private Brands, Inc. (hereinafter called "FinanceAmerica") and Associates Financial Services, Inc. (hereinafter called "Associates"). In open court at the trial of this cause which was held on March 28, 1985, all the parties consented to the relief sought by Associates; and the Court granted its motions. The First National Bank of Russellville (hereinafter called "the Bank") and the Trustee, Brent Thornley, Esquire, have objected to the Court's granting the relief sought by FinanceAmerica. This memorandum shall constitute the findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### FINDINGS OF FACT

Prior to filing their Chapter 7 petition, the Bishops operated a TV, stereo, and video rental business as Russellville Electronics & Radio Shack and as the Curtis Mathes Home Entertainment Center. Fi-

nanceAmerica "floor-planned" the Bishops' purchases of inventory from Curtis Mathes. Pursuant to a security agreement which was executed on June 19, 1978, FinanceAmerica took as security interest the debtors' inventory, equipment, and all cash and non-cash proceeds arising out of the sale thereof.[1] FinanceAmerica properly perfected its security interest by filing a financing statement with the Secretary of State of Alabama on August 17, 1981. FinanceAmerica obtained other security agreements covering the same collateral on June 13, 1979 and March 18, 1983 and filed financing statements on November 16, 1982 and March 13, 1984.

The debtors maintained two separate accounts with FinanceAmerica. The "Retail Account" covered items which the debtors maintained for the purpose of selling on a retail basis. The debtors also maintained a "Rental Account" which covered items which were leased out to customers.

Because the debtors were having trouble meeting the monthly payments to FinanceAmerica due to cash-flow problems, the Bishops contacted the Bank to investigate refinancing the Rental Account on more suitable terms. The Bank agreed to do so, but only if it could assume a first priority status on the rental inventory. Mr. Charles B. Elliott, a Loan Officer with the Bank testified that he supervised the Bishop account. Mr. Elliott stated that the Bank's standard procedure in such refinancing transactions was to contact the floor-plan financer to determine a pay-off figure before issuing a check payable to the floor-plan financer.

After determining the pay-off figure for the Rental Account, the Bank issued a check payable to the order of FinanceAmerica for $57,891.38 on June 13, 1983. This check was sent to FinanceAmerica's Dallas office by the Bishops on June 14, 1982 and was received on June 18, 1982. A memorandum bearing the following notation accompanied the check:

Enclosed is a check for $57,891.38 to be applied to the following account numbers. 69467, 75919, 84201, 84330, 88647, 89627, 89629, 91452 and 94666.

The Bank followed up this pay off by a letter to FinanceAmerica's Dallas office dated June 15, 1982 inquiring whether the Bishops were still indebted to the floor-plan finances. This letter was stamped "RECEIVED" by FinanceAmerica on June 21, 1982; and a copy was returned to the Bank bearing the following notation: "The above dealer [the Bishops] does not owe us anything."

Further, Mrs. Bishop testified that the paid-off rental units were deleted from the monthly Inventory Checklist which FinanceAmerica issued. On June 14, 1982, the Bank also took a security interest in all the debtor's inventory and equipment "now owned or hereafter acquired." The Bank perfected this security interest by properly filing a financing statement in the Office of the Secretary of State of Alabama on June 18, 1982.

Mrs. Bishop testified that approximately 100 rental units were acquired after the Bank's issuance of the check for $57,891.38. The Bank claims to have priority with respect to the rental units it paid off with its check of June 13, 1982 and with respect to the after acquired property clause in the security agreement and in the financing statement.

FinanceAmerica, on the other hand, disputes the Bank's contention that the Rental

1. These terms were further defined in the following provisions of the security agreement:
2. (a) Inventory means all of the following, whether now owned or hereafter acquired by the Debtor:
All present and hereafter acquired inventory where ever located.
(b) Equipment means personal property, including fixtures now or hereafter used or bought for use by Debtor in its business, together with all replacements, parts, or additions thereto.

(c) Proceeds mean all cash, chattel paper, contract rights, instruments, and accounts (as such terms are defined in the Uniform Commercial Code of the state in which Debtor is conducting his business) either now owned or hereafter acquired, and arising out of and received by the Debtor upon the sale of any item of inventory.
"Chattel paper" includes a lease of specific goods. Ala. Code Section 7–9–105(1)(b) (1975).

Account was paid off. FinanceAmerica contends that as of June 24, 1982, a balance of $2,158.00 remained outstanding on the Bishops' Rental Account. Also as of that date, a balance of $125,646.00 remained outstanding on the Retail Account. FinanceAmerica contends that it never released the rental units which were paid by the Bank's check of June 13, 1982 and that it is entitled to all of the Bishops' rental inventory.[2]

## CONCLUSIONS OF LAW AND APPLICATION TO FACTS

Because both the Bank and FinanceAmerica perfected their security interests by filing a financing statement, *see* Ala.Code Section 7–9–302 (1984 Supp.)[3], the priority of their respective security interests is determined Alabama Code Section 7–9–312(5)(a) (1984 Supp.). That section provides:

**Section 7–9–312. Priorities among conflicting security interests in the same collateral.**

. . . .

(5) In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4) of this section), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(a) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

*Id.* at Section 7–9–312(5)(a). This provision is known as the "first-to-file-rule." The

rules of Section 9–312 constitute a pure "race" statute, where the order of filing or perfection is king and knowledge is irrelevant. B. Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* 3.8[1] (1980). The policy behind this pure "race" rule is certainty, the need to rely on public records, the simplicity of the rule, and the view that lenders (both prior and subsequent) are provided with means to protect their interests. *Id.*

Alabama Code Section 7–9–316 (1975) is an example of one means the code provides for a later lender to protect his interests. That section provides:

**Section 7–9–316. Priority subject to subordination.**

Nothing in this article prevents subordination by agreement by any person entitled to priority.

Ala.Code Section 7–9–316 (1975). Regarding this section, Professor Clark has stated:

One of the most important priority sections of Article 9, but one which is rarely discussed, is Section 9–316. In a single short sentence that section makes explicit what most secured parties would assume anyway. Any of the priority rules can be reversed by a subordination agreement.

. . . .

The term "agreement" is defined in Section 1–201(3) to mean "the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (sections 1–205 and 2–208)." This means, for example, that a telephone conversation would suffice if it could be proved; there is no necessity for a writing. As indicated in the definition of "agreement," a subordination may arise out of a course of dealing between two competing creditors.

---

**2.** The Bishops filed their Chapter 7 petition on September 24, 1984. FinanceAmerica filed a proof of claim for $88,881.42 on October 25, 1984. The Bank filed a proof of claim for $172,006.41 on December 4, 1984.

**3.** Because the position of both parties were not fixed prior to February 1, 1982, the "new U.C.C.", *See* Ala. Code Section 7–11–101 (1984 Supp.), determines the priorities of the respective parties. *Id.* at Section 7–11–107.

. . . .

However, a subordination agreement does not render unperfected the security interest of the subordinated creditor. A misunderstanding between two creditors as to who has priority does not normally amount to a subordination agreement. Nor will the courts easily invoke estoppel to reverse priorities in the absence of an agreement between the creditors. However, there may be situations where the actions of one creditor amount to an estoppel, which could be imported into Article 9 via Section 1–103.

Clark at 3.10 (citing *Williams v. First Nat'l Bank & Trust,* 482 P.2d 595, 8 U.C.C. 679 (Okla.1971)).

The term "agreement" is defined in Alabama Code Section 7–1–201(3). That section states:

> **Section 7–1–201. General definitions.**
> (3) "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this title (sections 7–1–205 and 7–2–208). Whether an agreement has legal consequences is determined by the provisions of this title, if applicable; otherwise by the law of contract. (Section 7–1–103).

Ala.Code Section 7–1–201(3) (1975). In construing similar provisions of Oklahoma law, the Oklahoma Supreme Court aptly stated:

> It would therefore appear that a subordination "agreement" as envisioned by Section 9–316 may be informal, and need not rise to the full dignity of a contract; and being satisfied that the trial court's implied finding of the existence of such an agreement herein is supported by competent evidence, we concur in the trial court's judgment on the legal effect and consequences thereof.

*Williams v. First Nat'l Bank & Trust,* 482 P.2d 595, 596, 8 U.C.C. 679, 682 (Okla.1971).

■ Based upon the facts and circumstances of this case, *see id.,* the Court determines that such a subordination agreement existed between the Bank and FinanceAmerica with respect to the following account numbers 69467, 75919, 84201, 84330, 88647, 89627, 89629, 91452, and 94666. This determination is supported by the Court's finding that the Bank obtained the pay-off figure of $57,891.38 from FinanceAmerica over the telephone, by FinanceAmerica's deleting these units from the Inventory Checklists, and by the notation on the letter returned to the Bank stating that the Rental Account was paid off.

The Court is persuaded by the reasoning of the *Williams* decision; however, one point merits discussion. The *Williams* court seems to disregard the second sentence of Section 1–201(3) which states, whether an agreement has legal consequences is determined by the provisions of this title if applicable, otherwise by the law of contracts (section 1–103). *See* Ala.Code Section 7–1–201(3). "In other words, the Court must not only find an agreement; but it must also determine whether such agreement is enforceable."

As Professor Clark noted, a court may invoke the doctrine of estoppel to support a subordination agreement. *See* Clark at 3.10; *see also* Alabama Code Sections 7–1–103 and 7–1–201(3) (1975).

■ The generally recognized rule of law is that one having the right to accept or reject a transaction takes and retains benefits thereunder, cannot avoid its obligation or take an inconsistent position. *See Mobil Oil Corp. v. Tennessee Valley Auth.,* 387 F.Supp. 498, 514 (N.D.Ala.1974); *Birmingham Trust & Savings Co. v. Strong,* 194 So. 200, 207, 239 Ala. 118, 126 (1939); *Watt v. Lee,* 238 Ala. 451, 455, 191 So. 628, 630–31 (1939); *Nolen v. Nolen,* 345 So.2d 323, 325 (Ala.Civ.App.1977). In this case, FinanceAmerica should be estopped to deny that it agreed to be subordinated with respect to the above-listed account numbers since it clearly received a benefit from the $57,891.38 check. The agreement is, therefore, enforceable to that extent.

■ The last issue then is the question of priority with respect to the approximately 100 rental units acquired after June 14,

1982. The Court determines that the subordination agreement that was reached between the two parties did not extend to the after acquired units and that, therefore, the "first to file rule" of Alabama Code Section 7–9–312(5)(a) (1984 Supp.) governs priority with respect to these units. Because FinanceAmerica filed its financing statement on August 17, 1981 and the Bank filed its financing statement on June 18, 1982, FinanceAmerica has priority with respect to the after-acquired units pursuant to Alabama Code Section 7–9–312(5)(a) (1984 Supp.).

 The Bank and the Trustee contend that because FinanceAmerica was fully paid off in June of 1982, the August 17, 1981 filing is ineffective. The Court, however, must reject this contention. A financing statement is effective for a period of five years from the date of filing. Ala. Code Section 7–9–403 (1984 Supp.). Even if the entire indebtedness had been paid off, FinanceAmerica would not have had to refile to establish its priority. *See Provident Finance Co. v. Beneficial Finance Co.*, 36 N.C.App. 401, 245 S.E.2d 510, 24 U.C.C. 1332 (1978). Alabama Code Section 7–9–404(1) (1984 Supp.) specifically addresses this issue. That section provides in pertinent part:

> **Section 7–9–404. Termination statement.**
>
> (1) Whenever there is no outstanding secured obligation and no commitment to make advances, incur obligations or otherwise give value, the secured party must *on written demand by the debtor* send the debtor, for each filing officer with whom the financing statement was filed, a termination statement to the effect that he no longer claims a security interest under the financing statement, which shall be identified by the file number.

Ala.Code Section 7–9–404(1) (1984 Supp.) (emphasis added). Unless the debtor makes a written demand for a termination

---

**4.** While the *Provident Finance* case arguably suggests that FinanceAmerica should prevail under Ala.Code Section 7–9–312(5)(a) (1984 Supp.) with respect to even the "paid-off" units, the Court notes that case is distinguishable on that

statement, the secured party is under no duty to file one.[4] Therefore, the August 17, 1981 filing of FinanceAmerica is still valid.

### CONCLUSION

Because FinanceAmerica should be estopped to deny that it is subordinated with respect to the paid off units, the Bank has priority with respect to the accounts listed on the memorandum which accompanied the check which was sent to FinanceAmerica. Because the Court holds that the subordination agreement between the Bank and FinanceAmerica did not extend to the after-acquired units, FinanceAmerica has priority with respect to the approximately 100 units. (That is, all rental contracts coming into existence after the date of pay-off—*June 14, 1982* ).

---

issue since there was no basis for estoppel in the *Provident Finance* case and the Court in that case was not dealing with a subordination agreement under Section 9–316.