In re Emil S. MIHALKO, Debtor.

Emil S. MIHALKO, Plaintiff,

and

Acceptance Associates of America, Inc.,
Intervenor–Plaintiff,

v.

CONTINENTAL BANK AND TRUST
COMPANY and Edward Sparkman,
Trustee, Defendants.

Bankruptcy No. 87–03122F.
Adv. No. 87–0902F.

United States Bankruptcy Court,
E.D. Pennsylvania.

June 17, 1988.

R. Leonard Davis, Drake, Hileman &
Davis, Doylestown, Pa., for plaintiff/debtor, Emil S. Mihalko.

David I. Davis, King of Prussia, Pa., for
intervenor–plaintiff, Acceptance Associates
of America, Inc.

James W. Hennessey, Sherr & Zuckerman, Norristown, Pa., for defendant, Continental Bank and Trust Co.

Edward Sparkman, Philadelphia, Pa.,
Trustee.

OPINION

BRUCE I. FOX, Bankruptcy Judge:

The filing of a secured proof of claim by
Continental Bank and Trust Company (Continental) has triggered two related disputes, which have been consolidated and
now must be resolved. First, the debtor,
Emil Mihalko, filed an objection to Continental's proof of claim contending that the
sum claimed is excessive and requesting
that any claim allowed be classified as
unsecured; second, the debtor initiated an
adversary proceeding raising 11 U.S.C.
§ 506(a), (d) and arguing that both the value of Continental's collateral and the priority of Continental's mortgage lien render
the claim wholly unsecured. This litigation
precipitated a motion to intervene filed by
Acceptance Associates of America, Inc.

(AAA). As AAA's motion was uncontested, it was granted.[1]

The connection of AAA to this dispute will be discussed shortly, as it affects the analysis of the legal issues presented. Preliminarily, I note that Continental and AAA are adversaries in a state court lawsuit in which Continental seeks a judgment on a suretyship agreement entered into between the parties. AAA petitioned to remove that state court case to bankruptcy court pursuant to 28 U.S.C. § 1452(a) and Bankr. Rule 9027. In response to Continental's objection, the district court remanded the matter to state court. 28 U.S.C. § 1452(b). As a result, that litigation is not before me.[2]

Unlike many disputes involving § 506(a), (d), in which the central issue concerns the value of the collateral, see e.g. In re Everett, 48 B.R. 618 (Bankr.E.D.Pa.1985), these disputes find the parties in agreement as to both the value of the collateral and the number and amount of the mortgage liens against the property. Indeed, the parties have entered into a lengthy stipulation which sets forth many of the relevant facts to this dispute. What makes these disputes unusual, (perhaps even "incongruous", as suggested by AAA)[3], is that Continental and AAA argue that issues of subordination under both § 510(a) and (c) as well as marshaling are implicated. In fact, AAA, whose mortgage lien is recorded prior to that of Continental, prefers that its mortgage lien be subordinated to Continental's. To bring all of those issues into focus, I make the following findings of fact and conclusions of law in accordance with Bankr.Rule 7052.

## I.

1. In April 1985, the debtor decided to assist his son Stephan Mihalko in purchasing a restaurant known as the Blue Ram, which was located in Washington Crossing, Pa.

2. In April 1985 this restaurant was owned and managed by the Sanborn Corporation, a closed corporation controlled by Glenn Blakely.

3. On April 15, 1985 the debtor entered into an agreement to purchase the stock of Sanborn (and so the restaurant) for $385,000.00.

4. The debtor sought to finance virtually the entire purchase price with the assistance of a loan broker, Northeastern Financial Services, Inc. Financing was requested from AAA, which agreed to provide a loan in the amount of $195,950.00.[4] Thus, additional financing was needed.

5. The debtor requested additional financing from Continental, which agreed to lend $170,000.00.

6. AAA's initial commitment letter set forth various terms and conditions as prerequisites including that AAA obtain: a second mortgage on the debtor's residence located at 728 Collins Avenue, Lansdale, Pennsylvania; a pledge of all Sanborn Corporation stock; and, a security agreement covering all restaurant inventory and equipment. (Exhibit P–1).

7. Continental's commitment letter concerning its loan also set forth various requirements, including Continental's obtaining: a second mortgage on 728 Collins Avenue; corporate guarantees from both Sanborn and AAA; and assignments of notes receivable from Kenneth and Margaret Pavel as well as Eleanor and William Hotmann. (Stipulation, Exhibit 7).

8. In order for the debtor to obtain the requisite funding from both prospective

---

1. In his posttrial memorandum, the debtor argues that the motion to intervene was procedurally defective. Any such defect, however, was waived by the debtor's express consent to the motion. (Motion to Intervene, ¶ 8). See In re Stern, 70 B.R. 472, 473 n. 1 (Bankr.E.D.Pa.1987).

2. I disagree with the debtor's characterization of the state court lawsuit (see Debtor's Memorandum, at 25). The state court matter concerns the enforcement of the suretyship agreement—a matter I do not pass upon—rather than the issue of subordination.

3. AAA's memorandum of law, at 25.

4. AAA's commitment letter, Exhibit P–1, refers to a net loan amount of $182,200.00. The difference, in all probability, is related to costs, fees, and prepaid charges.

lenders, it was necessary for AAA and Continental to negotiate *inter se.*

9. Such negotiations took place with the following result: AAA agreed to permit Continental to obtain the second mortgage position on 728 Collins Avenue.[5] (The first mortgage was and still is held by Philadelphia Saving Fund Society ("PSFS")).

10. When the debtor requested these two loans, he understood that all, or virtually all, of his assets would be pledged as collateral for these loans, including the assets of Sanborn. How the lenders divided the assets in obtaining collateral as well as their respective priority positions was of no concern to him. (N.T. at 31, 36).

11. The AAA loan closing was scheduled for the morning of August 26, 1985 while the Continental closing was scheduled for the afternoon of August 26, 1985.

12. AAA knew of the scheduled Continental closing (N.T. at 43) while Continental, in all likelihood, also knew of the scheduled AAA closing.[6]

13. The AAA closing took place as scheduled. Among other documents, the debtor signed a mortgage agreement concerning 728 Collins Avenue which was prepared by AAA and which misspelled his last name. (i.e. Milhalko instead of Mihalko). By its terms, this mortgage agreement did not cover future advances.

14. In order to permit Continental to record its mortgage prior to the AAA mortgage, AAA instructed the title company clerk, who had conducted the closing, to wait "approximately one week" before recording the AAA mortgage. (N.T. at 47). The AAA mortgage was recorded on September 5, 1985.

15. The Continental closing did not take place on August 26, 1985; instead, closing occurred on September 12, 1985. During that intervening period, the AAA mortgage was recorded, AAA executed an unlimited surety agreement in favor of Continental (dated August 29, 1985), and Union National Bank and Trust Company executed a subordination agreement in favor of Continental (dated September 11, 1985). *See* Exhibit D–1.[7]

16. On or about September 12, 1985, AAA learned that the Continental closing had not occurred on August 26, 1985. (N.T. at 46; Stipulation, Exhibit 10).

17. Closing on the Continental loan occurred on September 12, 1985, and the Continental mortgage was recorded on September 16, 1985. Among the documents signed by the debtor at closing was an affidavit stating "that there are no encumbrances adversely affecting title to premises other than those shown on above-numbered Commitment to Insure of First American Title Insurance Company."

18. Continental had obtained a title search from First American on August 27, 1985 which did not disclose the AAA mortgage. A "bring down" search ordered by First American on September 11, 1985, in preparation for the September 12 closing, also failed to note the AAA mortgage.

19. The debtor filed a voluntary petition in bankruptcy under chapter 13 on June 25, 1987.

20. Continental filed a secured proof of claim on August 12, 1987 in the amount of $132,724.23. AAA filed a proof of claim in an "unliquidated" amount on November 24, 1987.

21. Between September 12, 1985 and June 25, 1987, neither Continental nor AAA took any steps to insure that Continental held the second mortgage position on 728 Collins Avenue. At trial, however, AAA

---

**5.** There were other terms to the agreement between AAA and Continental including a suretyship agreement in favor of Continental. (*See* N.T. at 51).

**6.** I appreciate that no evidence was offered which directly supports this finding as it relates to Continental's knowledge. Nevertheless, the Continental loan was conditioned upon AAA obtaining a lien upon Sanborn stock and assets.

It is unlikely that Continental would close without assuring itself in some manner that those conditions would be met.

**7.** The Union National mortgage on 728 Collins Avenue had been recorded in August 1984. Without this subordination agreement, Union National would have remained second mortgagee.

stated that it had no objection to subordinating its mortgage in favor of Continental.

22. As of June 25, 1987, 728 Collins Avenue had a fair market value of $195,000.00.

23. As of June 25, 1987, AAA was owed $197,208.53, Continental was owed $113,320.00 and the first mortgagee, PSFS, was owed $108,888.98.

24. Trial on the debtor's complaint and objection was heard on March 10, 1988. As of that date, PSFS was owed $109,579.79; Continental claims it was owed $148,825.00 and AAA claims that it was owed $240,728.55.

25. The Blue Ram restaurant, under the debtor's ownership, was not successful. On November 26, 1987, AAA conducted a sheriff sale of the personal property of Sanborn Corporation and was the successful bidder. No evidence was offered as to the value of these assets.

26. AAA, as of the date of trial, had taken steps to sell the stock and former assets of Sanborn Corporation to a third party which would assume liability on the debtor's loan to AAA. No evidence was presented whether such a sale ever occurred. On December 30, 1987 AAA exercised its stock pledge and now owns all of the Sanborn stock.

27. Continental has received, postpetition, as assignee of the Pavel and Hotmann notes, the total sum of $33,247.99.

## II.

I make the following legal conclusions:

1. The prepetition agreement between Continental and AAA that the Continental mortgage agreement would be recorded first constitutes a subordination agreement under 13 Pa.C.S.A. § 9316.

2. This agreement is enforceable in bankruptcy by virtue of 11 U.S.C. § 510(a).

3. Because the AAA mortgage lien is subordinate to Continental's lien, Continental has an allowed secured claim in the amount of $80,072.01, (it has already received $33,247.99 postpetition), pursuant to 11 U.S.C. § 506(a).

4. The debtor's objection to Continental's proof of claim is overruled to the extent it sought to have Continental's claim be allowed as unsecured only.

5. Continental's lien cannot be avoided by virtue of 11 U.S.C. § 506(d).

## III.

Certain of the issues raised by the pleadings have been resolved. The debtor no longer seeks a turnover of funds paid to Continental postpetition, pursuant to debtor's assignment of his rights under the Pavel and Hotmann mortgage agreements. The debtor concedes that he cannot adequately protect Continental's interest in these funds, *see United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), and so withdraws that portion of this adversary proceeding which sought a turnover. The debtor also acknowledges that the postpetition payment of those funds reduces Continental's claim to $80,072.01.

In addition, Continental's "counterclaim" against the debtor, alleging a violation of 11 U.S.C. § 523(a)(2), and requesting a determination that the Continental debt was nondischargeable was dismissed at trial. As this is a chapter 13 case,[8] 11 U.S.C. § 1328(c) makes dischargeable debts which would otherwise be nondischargeable in chapter 7. *See e.g., Matter of Gregory*, 705 F.2d 1118 (9th Cir.1983); *In re Gilliam*, 67 B.R. 83 (Bankr.M.D.Tenn.1986). Thus, whether the debtor committed fraud I need not decide.[9]

---

8. At trial, AAA suggested that this debtor did not meet the requirements of 11 U.S.C. § 109(e) and so could not file under chapter 13. Since there had been no such issue raised by the pleadings, (and a motion to dismiss under § 109(e) was not filed until two months after trial), I shall not address that issue now. I also conclude that issues under 11 U.S.C. § 109(e) do not concern

this court's subject matter jurisdiction, *Matter of Phillips*, 844 F.2d 230, 235 n. 2 (5th Cir.1988), so that they may be deferred.

9. The "fraud" alleged by Continental is that the debtor agreed to grant Continental a second mortgage, signed a document at closing stating, (in an eliptical fashion), that Continental would

What remains for me to determine is whether Continental holds an unsecured claim pursuant to 11 U.S.C. § 506(a), (d) because the value of the debtor's residence is exceeded by the sum of the PSFS and AAA mortgages. If so, it holds an unsecured claim.[10]

One might quickly (and erroneously) imagine that this dispute has no meaning to these parties. As for Continental, it holds a guarantee executed by AAA, so if it is not paid by the debtor it will be paid by AAA. If AAA pays Continental, it is subrogated to Continental's position, *see e.g., In re Miller,* 72 B.R. 352 (Bankr.W.D.Pa. 1987), and between AAA and Continental, all of the debtor's assets, plus all corporate assets are encumbered. Furthermore, AAA consents to be subordinated to Continental and have its mortgage lien avoided. While, in most instances, a debtor will not be affected under § 506 if the second and third mortgages exchange priority, in this circumstance the debtor vigorously opposes such a voluntary switch.

The debtor's opposition stems from his desire to avoid only the Continental mortgage in these bankruptcy proceedings. If he does so, he believes that AAA will (or must) look to the Sanborn assets to satisfy its claim. That will leave him with only the PSFS mortgage extant.[11] Continental's lawsuit in state court to enforce its guarantee has been opposed by AAA largely on the ground that Continental does not hold a second mortgage on the debtor's residence —which was a guarantee prerequisite. (Of course, that second position is held by AAA.) Therefore, Continental fears that if the debtor succeeds under § 506 and AAA succeeds in state court, it will hold only a partially secured claim.[12] Conversely, AAA fears that if the debtor is successful under § 506 and if AAA loses in state court, it will have to pay on its guarantee and obtain only Continental's unsecured claim in return. Since it has no future advance clause in its mortgage, any guarantee payments made to Continental would not be secured by AAA's mortgage agreement.

The end result is that both Continental and AAA request that the AAA mortgage be subordinated to Continental's. If such subordination were ordered, then Continental's secured claim would be allowed, (there being enough equity after the PSFS claim to render Continental's balance secured), Continental could look to the debtor's residence for payment and AAA need not pay on its guarantee.

## IV.

The debtor would have me approach the issue as a "simple" § 506(a) dispute. Since the lien claims exceed the value of the collateral, the most junior claims become

---

be second mortgagee, (*see* factual finding ¶ 17), and yet allowed AAA to be second mortgagee. Although I need not reach this issue, I cannot help but suggest that Continental's curious predicament has more to do with its own, with AAA's and with the title company's actions and inaction than with the debtor's.

Continental's assertion that the debtor is at fault because the AAA mortgage contained a misspelling of his name is no more persuasive.

**10.** My resolution of this dispute by utilizing 11 U.S.C. § 510(a) makes it unnecessary for me to address various issues raised by the parties, the most prominent of which is whether the AAA mortgage, containing a misspelling of the debtor's name, is ineffective under Pennsylvania law as to a subsequent mortgagee. *See generally, Coral Gables, Inc. v. Kerl,* 334 Pa. 441, 6 A.2d 275 (1939).

**11.** The debtor either assumes that the Union National mortgage lien will be avoided also, or

else he plans to bring a similar suit against it under § 506(a), (d). The debtor must also assume that if AAA satisfies its claim out of Sanborn assets that this creation of real estate equity, occurring postpetition, does not become property of the estate. If it were property of the estate, then the exemption limits of 11 U.S.C. § 522(d)(1) would apply, as would the "best interest of creditors' test" under 11 U.S.C. § 1325(a)(4). Given my disposition in this matter I need not address these assumptions. *But see In re Paollela,* 85 B.R. 974 (Bankr.E.D.Pa. 1988) *appeal pending.* I cannot help but note that the debtor's position that all aspects of this dispute are fixed as of the date this bankruptcy case was filed is somewhat undercut by his recognition that Continental's receipt of payments on the Pavel and Hotmann mortgages, which occurred postpetition, reduce its allowed claim.

**12.** The partial security comes from its receipt of payments on the Pavel and Hotmann notes.

unsecured.[13] He avers that the subordination issue was never raised in the pleadings and, even if it were, is irrelevant under § 506(a). I disagree however, with the debtor's interpretation of the pleadings. Continental's crossclaim against AAA raises the question of subordination. Moreover, the thorough discovery undertaken by all parties covered the Continental—AAA negotiations and agreement. Therefore, to the extent the debtor claims that he was surprised and unprepared for this legal issue and supporting evidence, (much of which is contained in the parties' pretrial stipulation of facts), I find such claim unpersuasive.[14] *See Western Auto Supply Co. v. Bank of Imboden,* 17 Ark.App. 4, 701 S.W.2d 394 (1986).

■ Furthermore, I find equally unpersuasive the debtor's position that the questions of subordination and marshaling are irrelevant to this dispute.

The purpose of 11 U.S.C. § 506(a) has been well stated by a leading commentator:

The first sentence of section 506(a) provides that an allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553, is a secured claim only to the extent of the value of such creditor's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent the value of such interest or such amount is less than the amount of such allowed claim. Stated differently, section 506(a) requires a bifurcation of a "partially se-

cured" or "undersecured" claim into separate and independent secured claim and unsecured claim components.

3 *Collier on Bankruptcy,* ¶ 506.04, at 506–15 (15th ed. 1987) (footnotes omitted). *Accord In re Everett,* 48 B.R. 618 (Bankr.E. D.Pa.1985). Its intent is to reflect the economic reality that an undersecured creditor cannot expect to look to its collateral for full payment of its claim and so is both a secured creditor and an unsecured creditor:

The Code scheme of Section 506 is that creditors receive through the valuation procedure of the Bankruptcy Court the same property value they would receive through a nonbankruptcy forced sale of the Debtor's nonexempt assets as of the petition date.... The operation of section 506(d) merely effectuates the market place.

*In re Tanner,* 14 B.R. 933, 936–37 (Bankr. W.D.Pa.1981).

The debtor presents its § 506(a) position as if AAA had a security interest solely in the debtor's real property. This is not so. Not only could AAA also look to non-estate property (the Sanborn corporate assets), but it held security interest in other property of the estate—namely, the debtor's interest in the corporate stock. While neither the stock nor the corporate assets were valued, there is some evidence of record that AAA was attempting to sell both and may have had some success. Moreover, the prospective buyer, according to AAA, would agree to assume the debtor's liability to AAA. (N.T. at 58–59).[15]

---

**13.** My review of the posttrial submissions discloses that all parties assume that if § 506(a), (d) is applicable then the appropriate date to apply (for valuation and other matters) is the date of the commencement of the bankruptcy case. On the issue of relevant time of the valuation, *compare In re Brager,* 39 B.R. 441 (Bankr. E.D.Pa.1984) *aff'd.* 49 B.R. 626 (E.D.Pa.1985) (commencement of the case) *with* 3 *Collier on Bankruptcy* ¶ 506.04 at 506–36 (15th ed. 1987) (effective date of the chapter 13 plan). For purposes of resolving this dispute, I shall accept as valid the parties' assumption.

**14.** The debtor was given ample opportunity to address the legal issue in his posttrial submission, and has done so.

**15.** At different times, all parties at trial suggested that the value of the restaurant might not be relevant to the issues at hand. After Continental and AAA offered evidence of the potential sale of the corporate assets and stock the debtor was permitted on rebuttal, to offer any valuation evidence it wished. This evidence consisted of the debtor's testimony that he last operated the restaurant postpetition and it continued to lose money. Such testimony, like AAA's testimony, is difficult to quantify. I note that the failure of the restaurant's income to meet expenses does not require the conclusion that the Sanborn stock and assets had little or no value. *See Norwest Bank Worthington v. Ahlers,* —— U.S. ——, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Munoz,* 83 B.R. 334 (Bankr.E.D.Pa.1988).

To the extent that the debtor suggests that the existence of other collateral in favor of AAA has no bearing on his § 506(a), (d) complaint against Continental, he is mistaken. For example, if a hypothetical creditor holds a security interest in two pieces of real property, (both of which are property of the estate), which have a combined value in excess of the creditor's claim, then it is difficult to treat this creditor as undersecured simply because the value of either piece of real estate is less than that creditor's claim. *See In re Bender*, 86 B.R. 809, 815 (Bankr.E.D.Pa.1988). *Cf. In re Panas*, 68 B.R. 421 (Bankr.E.D. Pa.1986) (in applying § 506(a) to debtor's interest in entireties property when only one spouse files for bankruptcy, court must look to value of the property taken as a whole when the creditor is a joint creditor).

I recognize that the analysis becomes more complicated where, as here, one seeks to apply § 506(a) to a creditor junior to one with multiple collateral. In such a situation, the value of the senior creditor's allowed secured claim may have to be determined with reference to all collateral, if the junior creditor can compel "marshaling". *Cf. In re Cook*, 67 B.R. 240 (Bankr.D.Minn. 1986) (when the junior creditor cannot compel marshaling—in fact, state law required the senior creditor to look first to the common collateral—the allowed claim of the junior lien creditor is determined without regard to the other collateral).

Marshaling has been defined by the Supreme Court:

> "[T]he equitable doctrine of marshalling (sic) rests upon the principle that a creditor having two funds to satisfy his debt, may not by his application of them to his demand defeat another creditor, who may resort to only one of the funds."

> \* \* \* \* \* \*

> "[I]t is well to remember that marshaling is not bottomed on the law of contracts or liens. It is founded instead in equity, being designed to promote fair dealing and justice. Its purpose is to prevent the arbitrary action of a senior lienor from destroying the rights of a junior lienor or a creditor having less security. It deals

with the rights of all who have an interest in the property involved and is applied only when it can be equitably fashioned as to all of the parties."

*Meyer v. United States*, 375 U.S. 233, 236–37, 84 S.Ct. 318, 321, 11 L.Ed.2d 293 (1963) *quoting Sowell v. Federal Reserve Bank*, 268 U.S. 449, 456–57, 45 S.Ct. 528, 530–31, 69 L.Ed. 1041 (1925). *See generally* Note, *Marshaling of Assets in Bankruptcy*, 5 Bankr.Dev.J. 309 (1987); Karavik and Kolodney, *The Doctrine of Marshaling Under the Bankruptcy Code*, 89 Com.L.J. 102 (1984).

Whether a party can compel marshaling may depend upon who is making the request, (i.e. a secured creditor as opposed to unsecured creditors or the trustee), *see generally, In re Mid–West Motors, Inc.*, 82 B.R. 439, 442–43 (Bankr.N.D.Tex.1988), and whether the senior creditor has recourse to assets which are entirely property of the estate. *See e.g., In re Oransky*, 75 B.R. 541, 543 (Bankr.E.D.Mo.1987) (senior creditor cannot be required to look to nonestate assets); *Matter of Maimone*, 41 B.R. 974, 984 (Bankr.D.N.J.1984) (marshaling does not apply to assets owned by a nondebtor); *Matter of Willson Dairy Co.*, 30 B.R. 67, 71–72 (Bankr.S.D.Ohio 1983) (marshaling does not apply to assets of nondebtor guarantor). *See also In re Tampa Chain Co.*, 53 B.R. 772 (Bankr.S.D. N.Y.1985) (assets of guarantor are subject to marshaling when conduct exists which justifies piercing the corporate veil).

Under the circumstances present here, Continental has a supportable position to compel marshaling by AAA, at least as to the corporate stock which is property of the estate (as distinct from the corporate assets). Not only are many of the traditional elements of marshaling present, but the parties also agreed that AAA would first look to assets other than real estate to satisfy its obligation from the debtor. The debtor, in turn, testified that he had no concern which creditor looked first to a given asset.

■ Although Continental might well be able to compel some marshaling, that is an issue I need not decide because AAA has

agreed to marshal, and has already begun to do so.[16] To the extent that the debtor opposes marshaling, I agree with the Ninth Circuit Court of Appeals, which "found no authority for the proposition that a trustee or debtor in possession may require a senior lienor to satisfy its claim out of a junior lienor's collateral." *In re Center Wholesale, Inc.*, 788 F.2d 541, 544 (9th Cir.1986). *Accord* Note, *Marshaling Assets in Bankruptcy: Recent Innovations in the Doctrine*, 6 Cardozo L.Rev. 671, 688 (senior creditor cannot be compelled to act detrimentaly to junior creditor).

Therefore, in order to apply § 506(a) to the Continental claim I need to consider the value of all of its collateral. Unfortunately, as I noted earlier, I cannot evaluate the debtor's corporate stock or the corporate assets. In such circumstances it is tempting either to state that the debtor has failed to meet its burden, *Matter of Lampert*, 61 B.R. 785, 787 (Bankr.W.D.Wisc. 1986) (debtor has an initial burden of production under § 506 similar to his burden under § 502(a)), and thus dismiss the proceeding, or to agree to the suggestion of Continental that the disposition of this proceeding await the sale of the other collateral. I shall resist the temptation for I conclude that the debtor's requested relief, the disallowance of secured status for Continental, must be denied due to 11 U.S.C. § 510(a).

## V.

■ Prepetition subordination agreements have long been enforceable in bankruptcy. *See In re Kors, Inc.*, 819 F.2d 19 (2d Cir.1987). Currently, 11 U.S.C. § 510(a) states:

A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law.

This subsection codifies results reached in decisions construing the former Bankruptcy Act of 1898. *See In re Kors, Inc;* Herzog and Zweibel, *The Equitable Subordination of Claims in Bankruptcy*, 15 Vanderbilt L.Rev. 83, 91 (1961) ("Herzog & Zweibel"):

Agreements to subordinate are uniformly enforceable and the particular chapter of the Bankruptcy Act in which the agreement is invoked will not affect its enforcement.

(footnote omitted).

The nonbankruptcy law referred to in § 510(a) is, in Pennsylvania and virtually all other states, found in § 9–316 of the Uniform Commercial Code:

Nothing in this division prevents subordination by agreement by any person entitled to priority.

13 Pa.C.S.A. § 9316. *See e.g., General Electric Credit Corp. v. Pennsylvania Bank & Trust Co.*, 56 Pa.D. & C.2d 479 (C.P., Crawford 1972).

By virtue of its prior recording of its mortgage, AAA currently holds the second mortgage position ahead of Continental. 42 Pa.C.S.A. § 8141(2).[17] The question though is whether AAA and Continental entered into a prepetition subordination agreement pursuant to 13 Pa.C.S.A. § 9316. If so, that agreement may be enforced in accordance with 11 U.S.C. § 510(a). Furthermore, if a subordination agreement exists, Continental would be granted a second lien position and there is sufficient equity given the value of the real property and the sum due to the first mortgagee that Continental would be a wholly secured creditor.[18]

---

16. Apparently AAA has already exercised on its stock pledge postpetition. As there was no relief from the automatic stay granted, this action must have been done with the debtor's consent.

17. Technically, in Pennsylvania priority of mortgage liens are established "from the time they are left for record." 42 Pa.C.S.A. § 8141(2). Although I noted in the findings of fact that the AAA mortgage was recorded on September 5, 1985, and the Continental mortgage was recorded on September 16, 1985, in accordance with the factual stipulation of the parties, (stip. # 43), it is probably more accurate to state that those were the dates upon which the mortgages were filed for recordation.

18. The residence has an agreed upon value of $195,000.00. PSFS, the first mortgagee has an allowed secured claim not greater than $110,-000. Continental has an allowed claim of approximately $80,000.00. Thus, these claims, if

The debtor argues that no subordination agreement between AAA and Continental was created prepetition. To the extent he refers to a formal written agreement, such as was entered between Continental and Union National, I agree. To the extent, however, the debtor believes that only a written formal agreement will suffice under § 9316, I respectfully disagree. Many courts have recognized that a subordination agreement under UCC § 9–316 may be established by document, oral communication, or even a course of conduct. *See e.g., Williams v. First National Bank and Trust Co.*, 482 P.2d 595 (Okla.1971); *In re Hilyard Drilling Co.*, 60 B.R. 500 (Bankr.W.D.Ark.1986); *In re Bishop*, 52 B.R. 470 (Bankr.N.D.Ala.1985); *In re AM International Inc.*, 46 B.R. 566 (Bankr.M. D.Tenn.1985); *General Electric Credit Corp. v. Pennsylvania Bank and Trust Co. See also Herzog & Zweibel*, at 91.

In the matter *sub judice*, the testimony offered along with the documentary evidence clearly reflect a prepetition agreement that as between AAA and Continental the latter would hold a mortgage lien prior to the former. Indeed, the president of AAA expressly so testified (N.T. at 42, 47).[19] Furthermore, AAA's letter to Continental dated August 29, 1985, in which it agreed to guarantee Continental's loan to the debtor, also agreed to the terms of Continental's commitment letter to the debtor which stated Continental's insistence on holding the second lien position. AAA also directed its settlement clerk to delay the recordation of its mortgage so as to allow Continental's mortgage to be recorded first.[20] Although this agreement is not couched using the term "subordination", I agree with the Oklahoma Supreme Court that such an agreement is, in essence, a subordination agreement under § 9–316. *William v. First National Bank and Trust Co.*, (oral agreement between creditors that the mortgage lien of one was to be recorded first constitutes a subordination agreement). *See also In re AM International, Inc.*, 46 B.R. at 571–73 (secured creditor's approval of an accounts receivable payment to a "lockbox" controlled by another creditor creates a subordination agreement).

Continental and AAA agreed prepetition that Continental would hold the second mortgage lien on the debtor's residence. That agreement gives Continental a right of subordination under 11 U.S.C. § 510(a), which AAA is willing to honor. Therefore, despite the objections of the debtor, I conclude that Continental holds the second lien position,[21] and has an allowed secured claim in the amount of $80,072.01.[22]

---

Continental holds a secured position behind PSFS would be fully secured. *See In re Windfelder*, 82 B.R. 367, 370 (Bankr.E.D.Pa.1988). I reject the debtor's contention that if the AAA mortgage lien is subordinated to Continental's then both liens are unsecured. Such an argument misstates the operation of § 506. *See generally, In re Simonson*, 758 F.2d 103 (3d Cir. 1985). Subordination by itself does not invalidate either the AAA or Continental liens. If the collateral were sold just prior to the bankruptcy filing, the debtor could not argue that proceeds should not be paid, after PSFS was paid in full, to either Continental or AAA. § 506 was to give practical effect to the result that would occur if the collateral were liquidated outside of bankruptcy.

Although not mentioned by the debtor I also note that 11 U.S.C. § 551 is not applicable to this dispute. *See In re Kors, Inc.*

**19.** Typically, decisions under § 9–316 resolve disputes between creditors, with one contending that no subordination agreement exists. Thus, I find unpersuasive debtor's argument that AAA's denial in its state court and bankruptcy court pleadings of Continental's asserted subordination rights precludes me from concluding that such an agreement exists.

**20.** In addition, both the suretyship agreement and AAA's position in the state court lawsuit reflect the parties' prepetition understanding that, insofar as the real estate was concerned, Continental would hold the prior lien.

**21.** Of course, though not presently before me, AAA's mortgage lien against the real estate is now in some jeopardy. I also need not decide whether the Union National lien or the AAA lien (or any other lien) is in third position.

**22.** By concluding that § 510(a) applies, I need not address § 510(c), equitable subordination. *See generally Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977); *In re AM International, Inc,* 46 B.R. at 573 (facts supporting conclusion that prepetition subordination agreement exists under § 510(a) also support equitable subordination under § 510(c)).

Appropriate orders shall be entered.[23]

---

**23.** My resolution of this dispute disposes of the Continental crossclaim against AAA.